

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUWLUS A. MUHAMMAD, | : | |
|     Plaintiff | : | Civil No. 04-131 Erie |
| v. | : | |
| | : | |
| ERIE COUNTY DISTRICT ATTORNEYS' | : | MAGISTRATE JUDGE |
| OFFICE, BRAD FOULK, ESQ., FIRST | : | PARADISE-BAXTER |
| ASSISTANT, D.A. ROBERT SAMBROAK | : | |
|     Defendants | : | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT PURSUANT TO Fed. R.C.P. 56(b) FILED ON BEHALF OF DEFENDANTS, ERIE COUNTY DISTRICT ATTORNEY BRAD FOULK AND ROBERT SAMBROAK

**I.**    **Factual Background**:

Plaintiff, Buwlus Muhammad, filed a complaint against Erie County District Attorney, Brad Foulk, First Assistant District Attorney, Robert A. Sambroak, City of Erie Chief of Police, Charles Bowers, Jr., Erie County Detectives' Office, et al. Plaintiff failed to identify the individuals or entities referred by "et al." He also failed to effect proper service upon the defendants and subsequently filed a motion for default judgement. On August 18, 2004, the Honorable Sean J. McLaughlin denied plaintiff's motion for default judgement and defendants agreed to accept service.

All defendants filed motions to dismiss plaintiff's complaint pursuant to Fed. R.C.P. 12(b)(6). On September 23, 2004, plaintiff filed a motion to amend his complaint, which was denied by Order dated September 29, 2004, because of plaintiff's failure to attach the proposed amended pleading to his motion. On November 16, 2004, plaintiff filed another motion to amend complaint, which was granted on December 1, 2004, and defendant Bowers and Erie County Detectives' Office were dismissed from the case. It is believed and therefore averred that

plaintiff filed his amended complaint against defendants Foulk and Sambroak on or about December 1, 2004.

In his amended complaint, plaintiff alleges that criminal charges were filed against him for burglary and tampering with evidence and that he was incarcerated because of providing testimony for a defendant Tyshun Ronzel Taylor, who was charged with drug possession, during a preliminary hearing before District Justice, Paul Urbaniak. (¶¶ 5, 6, 7, amended complaint) Plaintiff further alleges that defendant Sambroak attempted to "intimidate" or "scare" plaintiff from testifying by informing plaintiff prior to the preliminary hearing that he would be arrested for burglary and other criminal charges if he testified on behalf of Mr. Taylor. (¶ 7, amended complaint) Plaintiff also avers that after testifying on behalf of Mr. Taylor, he was arrested and "criminally charged without a lawful police investigation or probable cause" and that he spent approximately four to five days in the Erie County Prison before posting a $2,500 bond. Plaintiff alleges that all criminal charges previously referenced were eventually dismissed. (¶ ¶8, 9, 10, 11, 12, amended complaint)

A reading of the amended complaint reveals that plaintiff is proceeding under 42 U.S.C. §1983 and Title 65, sec. 530 and Rule 15 (A) Fed. R. Crim., alleging some type of conspiracy to wrongfully arrest and incarcerate plaintiff in retaliation for testifying on behalf of Mr. Taylor at the preliminary hearing on December 28, 2001.

A review of the preliminary hearing transcript indicates unequivocally that plaintiff testified that a street person named "Yackie" paid him $150 to set up Mr. Taylor for drug possession charges. Plaintiff testified, under oath, that he accepted the $150 and crawled into a window at 912 Wallace Street, Mr. Taylor's residence, and placed a bag that Yackie gave

2

plaintiff that contained a hard substance, in a pair of pants that were in the apartment. At the preliminary hearing plaintiff admitted that by breaking into the house and crawling through the window, he committed burglary and that he knew he was probably committing a crime by trying to set someone up. The following relevant colloquies took place during the preliminary hearing:

> The Court: At this time Attorney Placidi is calling you to the stand to testify to the Court truthfully as to what your statements have been. The District Attorney's office has made a statement to inform you that if you were part of a crime and you're testifying to it as I swear you in on your oath, that you will be charged for any criminal activity that you're going to testify to at this point in time, just so you're aware of those facts before you begin to testify and before I swear you in.
>
> The Witness: Yes.
>
> The Court: Do you understand what I'm telling you?
>
> The Witness: Yes, I do.
>
> The Court: Do you wish to proceed?
>
> The Witness: Yes, I do.

(Exhibit 1, pg. 2)

* * *

(By Mr. Placidi)

> Q: Okay. And could you tell me what you told me at that meeting on December 17th at 2001?
>
> A: I told you that a female came to me – I think it was that Monday on the second or

the 3rd of December I think it was somewhere around November, December – November. I think her street name was Yackie.

Q: Okay. And where did you meet this or where did –

A: I think at the place on 11th and Parade Street.

Q: What did this female say to you?

A: She was telling me she was being threatened by some guys.

(Exhibit 1, pg. 5)

* * *

Q: (By Mr. Placidi) Okay. Did she tell you anything or did she ask you to do anything at that time?

A: Well, she asked me to place – she needed someone set up.

Q: Okay.

A: Okay.

Q: And did she tell you the name of the person she needed set up?

A: No, she didn't.

Q: Did she tell you where the person resided?

A: 912 Wallace.

Q: Okay. And did you agree to do it at that time?

A: No, I didn't.

Q: Okay. Did you have a subsequent or conversation with her after that Monday?

A: On a Wednesday.

Q: Okay. And that Wednesday would have been December 5th of 2001?

4

A: I believe so, yes, sir.

Q: And could you tell us what happened, where that conversation took place?

A: I think at 901 tavern, on 9th and Parade, I'm pretty sure.

Q: And what time did the conversation take place?

A: Around eight o'clock, somewhere eight – between eight and nine o'clock.

Q: Okay. And on the meeting on Monday with this person named Yackie, did you have an agreement to meet her there at that time?

A: Yes, I did.

Q: That would have been on December 5, 2001?

A: Yes, I'm pretty sure.

Q: And what time were you supposed to meet her?

A: You talking about on the 5th?

Q: Yes?

A: I think it was ten o'clock, somewhere around there between eight and ten, somewhere around there. I believe it was ten o'clock.

Q: And you were supposed to meet her at 901 tavern, 9th and Parade?

A: Yes, sir.

Q: And did you go there?

A: Yes, I did.

Q: And when you got there, was she there?

A: Yes, she was.

Q: Okay. And tell us what happened after you met her?

A: She offered to pay me a hundred dollars to take a package, I don't know what was in the package, and to go to 912 Wallace. And she told me that if the door wasn't open, the first window to the door would be open. And I asked her again whose residence was it and why was she doing this? And she told me because someone had threatened her, to do harm to her or her family, because of some cocaine, four to six ounces of cocaine came up missing, and unless she set this person up to prove that he had some involvement or knowledge of it, that they would do her some serious harm. And I told her I wasn't sure about this because – and I asked her how does she come – why she come to me, and she told me because, you know, she heard about me being offered pay for other incidents in the past as far as the case that is coming up in this January.

Q: Okay. Did she offer you money to do this?

A: She offered me $150 just to go in and put a package in the residence.

Q: Okay. At some time did you agree to put the package in?

A: I still was undecided. She hadn't had the package at that time. She said she was waiting on it. I again asked her what the person's name was. She refused and she refused to tell me.

Q: At sometime that evening on December 5th of 2001 did you agree to deliver the package for her?

A: I agreed to.

Q: Okay. Did she pay you any money at that time?

A: A hundred dollars she did.

6

Q: Okay. And did you in fact deliver the package to 912 Wallace Street?

A: At first I didn't. No, I didn't. It wasn't there. She was waiting on it. So she – around close to eleven o'clock I think she met somebody. I told her I'd be back. I came back. She said close to eleven o'clock somebody would be there around that time. I came back close to eleven o'clock, she pulled me back at 901, she gave me a package and gave me $100 and told me should would give me the other fifty when I come back.

Q: Okay. When you came back from what?

A: Placing the package in the residence.

Q: Okay. Did you place that package in that residence then?

A: Yes, I did.

Q: And can you tell us how you did that?

A: Window by the first door, by the entrance.

Q: Any you're talking – by "window" you're talking about a window at 912 Wallace Street?

A: Yes, uh-huh.

Q: And did you make entry through the window?

A: Yes, I did.

Q: Was the window unlocked?

A: Yes, it was.

Q: And where did you place the package when you went inside?

A: At first I was skeptical. I didn't know really – I just went in, I wanted to get in

there and out of there. There was a couch as soon as you come in the window with some clothes all over the apartment, so I just – the first thing came to my mind: Get it in, get out. Was a pair of dark pants on the love seat, small couch. I just put it in the pocket and I came out of there, came back out of the window, went back out on the street.

Q:  Do you know what pocket of the pants you put it in?

A:  No, I don't.

Q:  And were you able to make out the type of pants it was?

A:  Just dark, rough pants.

Q:  Were they jeans-type pants?

A:  Yes, uh-huh.

Q:  And was anybody home when you went into the house?

A:  No, there wasn't.

Q:  At that time did you know whose house it was?

A:  No, I didn't.

Q:  And what did you do after you left the house?

A:  I went back and she gave me $50.

Q:  Okay. Did you tell her that you completed what she asked you to do?

A:  No, I didn't tell her that.

Q:  Well, did you tell her you would deliver the package?

A:  I didn't tell her anything, I just told –

Q:  Gave you the $50. And can you describe the package that you delivered?

8

A: I don't have – I really didn't see the package that we well. I just grabbed it and took off. It was a thing like a bag, something like a sandwich bag, but I didn't really look at the package. I didn't know what it was in it.

Q: Do you know what was contained inside the bag?

A: No, I don't.

Q: Was it a clear bag?

A: It was dark out. I couldn't really make out what was in that package.

Q: Did you see any type of coloring inside the bag?

A: No, I didn't.

Q: Do you remember stating to Mr. Phillips and myself that it appeared to have some type of silver package inside it?

A: He stated that. He asked me was it in a silver type of package in there, and I told him I couldn't make out clear what was in the package.

Q: Do you remember stating something that it felt like crack cocaine inside it?

A: I told him pills, pills or something hard substance.

Q: And why did you contact me?

A: Because I feel remorseful after I found out what he was – someone was arrested for cocaine that resided at that apartment.

Q: And how do you know that the package that you delivered was the same package that –

A: I don't know that.

Q: What made you think that?

9

A: Because I did enter that apartment.

Q: And you entered that apartment on December 5th of 2001?

A: Yes, sir.

(Exhibit 1, pgs. 6, 7, 8, 9, 10, 11, 12)

* * *

(By Mr. Sambroak)

Q: Well, you understand that by breaking into that house, crawling through the window, you committed burglary, don't you?

A: I didn't know if anyone stayed there, you know, for actually.

Q: You knew you were committing a crime by going into the house, right?

A: Yes, I did.

Q: Okay. And you knew you were probably committing a crime by trying to set somebody up?

A: Possibly.

Q: Yeah. But you don't know what was in that package?

A: No, sir, I don't.

Q: Did the package fit in your pocket?

A: I just – I just jammed it in.

Q: The pants pocket?

A: Yes, sir.

Q: You didn't go into the bedroom at all?

A: No, sir.

10

Q: You just went into one room?

A: That's all.

Q: Any you're saying the sofa was by the window?

A: Yes, it was.

Q: And whatever was in that package you just put it in somebody's pants pocket?

A: Right.

Q: Okay. You didn't put anything anywhere else?

A: No, sir.

Q: You didn't have razor blades?

A: No, sir.

Q: You didn't have baggies with you?

A: No, sir.

Q: Okay. Just so we're clear, you do understand you committed a crime breaking into that house?

A: Yes, sir.

Q: Okay. And – but you're telling us that you don't know what you were carrying?

A: No, sir, I don't.

Q: But you do know you were involved in setting somebody up?

A: Possibly, yes, uh-huh.

Q: Well, what do you mean "possibly." That was the whole reason this Yackie wanted you to do that, right?

A: Yes, uh-huh.

(Exhibit 1, pgs. 13, 14, 15)

Plaintiff also filed a "Motion for Preliminary Prohibitory Injunctive Restraining Order" and a "Preliminary Prohibitory Injunction Restraining Order". In her report and recommendation filed on October 5, 2005, the Honorable Susan Paradise Baxter recommended that these filings by plaintiff be denied. By Order dated October 26, 2005, the Honorable Maurice B. Cohill, denied plaintiff's "Motion for Preliminary Prohibitory Injunctive Restraining Order" and his "Preliminary Prohibitory Injunction Restraining Order" adopting the report and recommendations filed by Judge Baxter.

**II     Argument**

    **A.     SUMMARY JUDGEMENT SHOULD BE GRANTED AND PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED, WITH PREJUDICE, BECAUSE A REVIEW OF THE RECORD INDICATES THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND NO EVIDENCE TO SUPPORT A VIABLE CIVIL RIGHTS CLAIM BASED UPON PLAINTIFF'S ARREST AND INCARCERATION FOR BURGLARY AND TAMPERING WITH EVIDENCE.**

Plaintiff was warned prior to testifying on behalf of Mr. Taylor at the preliminary hearing on December 28, 2001, that if he testified, under oath, that he broke into 912 Wallace Street, Erie, Pennsylvania, and placed a bag containing a hard substance in the pants of the resident of 912 Wallace Street, to set him up on drug charges, plaintiff would be arrested for this criminal activity. Despite the warnings of defendant Sambroak and District Justice Paul Urbaniak, plaintiff did in fact testify, under oath, that he crawled through a window at 912 Wallace Street and placed a bag that contained a substance that felt hard in a pair of pants that he found in the apartment, at the request of a street person named "Yackie", who paid plaintiff $150 to set up the

12

resident at 912 Wallace Street, on drug charges. Plaintiff further testified during the preliminary hearing in response to questioning by defendant Sambroak that he was aware that he committed the crime of burglary and that he believed it was a crime to attempt to set up an individual in this manner.

In light of plaintiff's admissions, there is no genuine issue as to any material fact in this case and it is abundantly clear that plaintiff cannot prove a viable civil rights claim at trial. There is simply no evidence that plaintiff was arrested and incarcerated without probable cause, in retaliation for his testimony on behalf of Mr. Taylor.

**B.   SUMMARY JUDGEMENT SHOULD BE GRANTED AND PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED, WITH PREJUDICE, BECAUSE A REVIEW OF THE RECORD INDICATES DEFENDANTS FOULK AND SAMBROAK ENJOY ABSOLUTE IMMUNITY UNDER THESE CIRCUMSTANCES.**

Judicial officers and those who perform functions closely associated with the judicial process are immune from damage suits arising out of their official duties. *See* Cleavinger v. Saxner, 574 U.S. 193 (1985); Hanig v. Odorioso 385 F. 2d 491 (3rd Cir. 1967) It is well settled that there is absolute immunity for prosecutorial activity. Imbler v. Pachiman, 424 U.S. 409, 427 (1976)

The evidence of record does not support plaintiff's contention that his arrest and incarceration on the charges of burglary and tampering with evidence were retaliatory and without probable cause. His admissions that he accepted money to break into 912 Wallace Street and place a package in the resident's pants, to set him up on drug charges, conclusively establishes that defendants Foulk and Sambroak were carrying out their official duties by having plaintiff arrested and incarcerated for admitting under oath to the commission of the crimes of burglary and tampering with evidence.

WHEREFORE, it is respectfully requested that this Honorable Court recommend that defendant's motion for summary judgement pursuant to Fed. R.C.P 56(b) be granted and that plaintiff's amended complaint, be dismissed, with prejudice.

Respectfully submitted,

S/ Matthew McLaughlin
Matthew J. McLaughlin, Esquire
Assistant Solicitor for Erie County
246 West Tenth Street
Erie, PA 16501
(814) 454-1010
Counsel for defendants, Bradley Foulk, and Robert Sambroak

Dated: October 31, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BUWLUS A. MUHAMMAD,<br>    Plaintiff<br>    v.<br><br>ERIE COUNTY DISTRICT ATTORNEYS'<br>OFFICE, BRAD FOULK, ESQ., FIRST<br>ASSISTANT, D.A. ROBERT SAMBROAK<br>    Defendants | Civil No. 04-131 Erie<br><br><br>MAGISTRATE JUDGE<br>PARADISE-BAXTER |

## CERTIFICATE OF SERVICE

I, Matthew J. McLaughlin, Esquire, do hereby certify that on the 31st day of October, 2005, a true and correct copy of the foregoing brief in support of motion for summary judgement pursuant to Fed. R.C.P. 56 (b), was served upon the following named person via United States first class mail, postage prepaid, in accordance with the applicable Rules:

Buwlus Muhammad
c/o Erie County Prison
1618 Ash Street
Erie, PA 16503

Respectfully submitted,

S/ Matthew McLaughlin
Matthew J. McLaughlin, Esquire
Assistant Solicitor for Erie County
246 West Tenth Street
Erie, PA 16501
(814) 454-1010
Counsel for defendants, Bradley Foulk and
Robert Sambroak